Are you going to address the cross-appeals in your first 30 minutes or are you going to... If you're honest, may I inquire how much total time we have? You have 30 minutes per side. For both the appeal and the cross-appeal. Right. So have you thought about... The rest of our appeal for the first 15 minutes and then in our closing, respond to whatever has been said by the other side. You'll reserve 15 minutes. Yes. All right. You may proceed. Can I... For the proceed, can I clarify if we're going to... We assumed that we were going to be doing arguments in the same form that we did the briefings so that they would start with their cross-appeal in a special circumstance. We would respond in a special circumstance and then address the cross-appeal. No, that's not the way we proceed. Unless you reserve some time within your 30 minutes. Right. If we reserve some time, we can have a final... Right. Right. But it's 30 minutes total. However you want to break it up. All right. You may proceed. Good morning. California Deputy Attorney General Susan Lee Frierson for respondent with co-counsel, California Deputy Attorney General Kyle Brody, Phyllis Brody at council table. May it please the Court. Twenty-eight years ago today, December 7th, 1978, trial began in a California courtroom that resulted in a jury finding Earl Lloyd Jackson guilty of two burglaries and two first-degree murders, one of Bernita Curtis and then approximately a week later, one of Gladys Ott. The jury also found to be true two special circumstance allegations under California's death penalty law and respondent is here today appealing the district court's grant of Jackson's petition for writ of habeas corpus as to the two special circumstance findings. Can I ask for clarification? I just want to make sure this is clear in my mind as to what the posture of the case is. As I understand it, the state is not appealing the grant as to the penalty, which means that if the state wishes to seek the death penalty, you will have to go back for further proceeding. Is that correct? Proceeding in state court. In state court on the death penalty. Yes. Okay. And that you don't contest. So the only thing that's before us today, at least on the state's appeal, is whether or not Jackson is death qualified. It's an appeal of the special circumstances. Were we to grant the writ, then you would have to go back for sentencing but without the ability to sentence him to death. If we were to reverse the district court's grant of the writ, then we would find and were to uphold the special circumstances, then as you proceeded in state court, you would be able to seek the death penalty once again. That is correct. So you are not, you're forgoing your appeal of the death penalty here, but you think you are reserving your right if we were to reverse the special circumstances to nevertheless ask to reinstate the death penalty in state court? After another trial, Your Honor. So you would have, and is that what the state would plan to do? To try him again? For the death penalty, if we were to reinstate the special circumstances? That would be a decision by Los Angeles County District Attorney's Office, right? If the special circumstances were in effect reversed, then before the, then before Jackson could be even remotely sentenced to death again, the California, Los Angeles County District Attorney's Office would have to retry the special circumstance part of the trial. And that's if you're trying to preserve the opportunity to do that. Well, we want to avoid another trial on the special circumstances. If he was not, if the court, this court, reversed the district court with regard to its grant of the writ as the special circumstances, then what the Los Angeles County District Attorney's Office could do would be to have a penalty trial, a brand new penalty trial, and seek the death penalty. If, and that would of course involve aggravating and mitigating circumstances as to whether the death penalty should be imposed on Jackson. If, however, this court affirms what the district court did in granting the writ with regard to the special circumstances, then the choice facing the Los Angeles County District Attorney's Office is whether it should have, before it even gets to a penalty trial, I'll call it a special circumstance allegation. There would effectively be a new trial on the merits, except that we would concede that he committed the murder and that he committed the burglary. Yes. Have you spoken with the L.A. District Attorney's Office to know that in fact they will seek the death penalty? I do not know one way or the other, Your Honor. I have spoken with them and that decision has not been made. Now, wasn't there a condition, I mean, isn't there a time limitation for them to make that decision given the district court's decision that the special circumstances should be reversed? This was a conditional grant of the writ and that's been stayed, Your Honor. All right. Why don't you proceed with your argument now? Thank you. The issues concerning, most concerning to us today are the issues concerning prosecution witnesses, Ronald McFarland and Mark Mickles. And even though both McFarland and Mickles testified to admissions that Jackson had made to them about killing two older women, and even though the prosecutor did not disclose evidence that could have been used by the defense to impeach those two and further did not correct their false testimony, and even though Jackson's trial counsel did not investigate either Mickles or McFarland before they testified, Jackson is entitled to no habeas relief on the special circumstance findings regardless of the applicable review standard. And this is because they would not have been impeached. And they would not have been impeached because the jury still, still would have had before it evidence that both McFarland and Mickles, when recounting Jackson's admissions, attributed to him statements that included details of the crimes that, from the jury's perspective in 1978 and 1979, confirmed the truth of Mickles and McFarland's testimony about Jackson's admissions. Those, several of those details matched the crime scene and the autopsy evidence and some of what Jackson told the police. For example, there was no evidence before the jury that McFarland was a participant in the killing of Curtis and Ott, yet McFarland knew details such as Jackson entered Ott's apartment through the kitchen window, and that's what Jackson told the police, and that's confirmed also by the crime scene. McFarland knew that Jackson was concerned about Ott making noise. In Jackson's statement to the police, he said he had directed Anthony not to let Ott's mouth loose so she could holler or something. McFarland knew that Jackson had beat Ott. Well, the coroner's testimony about her injuries, many of those could be caused by a fist. McFarland wasn't saying, Jackson told me that he killed her in some general generic way, and he didn't say, yeah, he thought he stabbed her. There's no evidence of any stabbing. He said he beat her, and that's what the coroner said, that some of her injuries were caused by a beating or by a fist. Ms. Frierson? Yes. Aren't you making the case for why their testimony was material? I'm making the case for why there are two issues. There are two not issues, two concerns in determining the effect of failure to disclose and failure to correct false testimony. One of those issues is whether the affected witness was a centerpiece of the prosecution's case, whether the witness was the glue that held the prosecution's case together. The second thing was whether the second consideration is whether what would have impeached the witness would have had any effect whatsoever on the jury. There was, from the perspective of the jury in my view. But you're arguing that their testimony was so unimpeachable because it was the only testimony, and it was the only testimony that actually placed Jackson in the room, in the position of beating up Ott, Mrs. Ott, and of using the bottle on her. No, Your Honor. Okay. No. What was the other evidence of that, specifically? Specifically. Jackson himself, himself, placed himself in the room with Ott when she went from the state of, from his perspective, enough consciousness to tell him, to be able to tell him where the money was when he demanded it of her, until he left, and in his words to the police, she was snoring, she seemed passed out. He placed himself in the room, and when he was in that room, Ott necessarily had to have gone from a state of consciousness to the state of snoring, and what happens to Ott in that room that caused her to go from a state of consciousness to a state of snoring was that, among other things, she received a direct blow to her left eye, she had a fracture of her right jaw, six fractured ribs on her right side, five on the front. We know all the injuries. We know all the injuries. All right. The question is, did, to succeed on your special circumstances argument, did Mr. Jackson make those injuries? All he needed to do, as far as 1977 California death penalty law is concerned, is to physically assist, and the jury... With the intent? I mean, and... Yes. And with the intent to kill. And with the intent to kill. Wasn't that what the whole special circumstance was about? The intent, the mental state? Well, there were several elements, but intent to kill is a key element. Well, that's the only element, really, for all intents and purposes. They disappear. They disappear. All right. Am I missing something? No, that was the focus of the district court. There's really no dispute that he was there. The intent to kill. The intent, the mens rea. The mens rea. The mens rea was also contained in his statement to the police, and here is why. What he told the police explicitly was that he had hit Ott once on the jaw. He admitted to hitting her once on the jaw. He implicitly admitted that he used the wine bottle on her, and here is why he... No, he did not implicitly, he did not say anything of the kind. What he said was that he touched the brown bottle. And the context of his saying he touched the brown bottle is as follows, Your Honor, and bear with me just for a moment. This occurred right after he was brought in to talk to the... Not brought in. He turned himself in to the police, but brought right in to the interview room. And there was an initial conversation, Your Honor, in which there was talking about how the police had been looking for him for several days, and he said, well, the last time I saw the police was when they came up to my apartment and talked to me and asked me if I knew anything about those old ladies' deaths, and I said no. The very, very next question asked of him by a detective was, how come we found your fingerprints in a lady's house? The police did not say what house, and what did Jackson do? Jackson started into this story about working out on the balcony after midnight and then deciding to go to somebody's house and walking past Ott's door. He didn't say Curtis's door. He said Ott's door, the second murder. The door was wide open. He walked in. He walked in to this wide open door after midnight, went all the way back to the bedroom. You don't have to yell. We can hear you. I apologize. You can use the microphone for taping purposes, but you don't have to yell at us.  All right. I apologize, Your Honor. If he walked directly back to her bedroom and had felt the need to explain one fact, no formal interview had begun yet, and yet what was on his mind is that what he had to explain to the police was not that his fingerprints might be found in Curtis's apartment, not that they might be found on the kitchen window sill that he climbed into Curtis's apartment, not on any item that was in the apartment during the ransacking of the cupboards and the door handles, and he went into the couch and he picked up lamps and knick-knacks. Imagine, he was supposedly in the apartment for one or two hours. Think of all the things he could have touched. No. He had to come up with an explanation for why the police might have found his fingerprints on a bottle that was in the bedroom of Mrs. Ott. Your Honor, he placed his hands on that bottle. In light of what we know about Mr. Jackson's IQ and brain damage, et cetera, now in hindsight, do you really think he was that smart and calculating to be able to do that? When you're facing a death judgment, I don't think anyone's smart enough to figure out that that's what they have to explain. And they have no evidence and there's no allegation of an IQ that could not. Your point is, I gather, that implicit in his statement about the bottle, was it he used that bottle? By using that bottle, he did it with the intent to kill her? No, not with the intent. I'm just curious about the men's ramp. The bottle did not, use of the bottle did not kill Mrs. Ott. But if one takes a look at her injuries as a whole, at what happened to her in that room, the use of the bottle reflects, bespeaks an intent on Jackson's part to annihilate her, to, looking at the injuries as a whole, this was an attempt to destroy her, an intent to kill her. And I will very quickly, because I see my 15 minutes is, I'm exceeding this. Go ahead. Is that, we must remember this is a four-unit apartment building. Two units upstairs, two units downstairs. He lives there. He passes by, he lives upstairs. He passes by Mrs. Ott's door, Mrs. Curtis's door every day. These are people who know him. So he's in Mrs. Ott's apartment a little over one week after he participated in the killing of Mrs. Curtis. And she wakes up. She's awake. She can recognize him. He's going down not just for the burglary, he's going down for the murder across the hall of Mrs. Curtis. I want to ask you a factual question. So all this comes out in the second interview and the officers who are interviewing him are Colette and Jackson, right? Or is the second, this is the second confession, second time they talked to him. The second portion of the interview? That's in the bottle. Too often. It's Jackson and Colette, right? I am not sure who it is. Well, it's in the transcript. It's Jackson and Colette. Who, I understand that one of your arguments is that the prosecutor is insulated from having committed a Brady violation because the prosecutor didn't know what the police detectives knew. And so we can't impute that knowledge to the prosecutor. I'm just wondering, who did Michaels and or McFarland approach with it? It says detectives. Was it Colette? Michaels had his juice lady, and his juice lady was a deputy sheriff named Shea. And I am not recalling how he first connected up with her, but she was the conduit for the connection on all the cases. Jackson and Colette were the officers in the Long Beach police department or LAPD? Colette was in Long Beach. They were Long Beach police officers, not L.A.? Correct. Okay. And Deputy Shea, which facility was that that she was attached to? I think she was attached to the county jail. And is that where McFarland and Michaels were being held? Yes. And she had nothing to do with McFarland. It is not clear how McFarland came to be interviewed by Colette or his partner. McFarland was eventually interviewed by Colette or his partner. This is where it troubles me. I was on a case, Goldstein v. Harris, where Colette was the same officer and there was a confidential informant named Fink, and the same situation occurred with somehow the Brady impeachment evidence just was not ever disclosed to the prosecutor and, I mean, to the defense attorneys, and it turns out that Mr. Goldstein was actually innocent. Now, we know that Mr. Jackson is unlikely to be actually innocent, but it does raise the concern of the confidential informants and the practices with respect to the Long Beach police officers back in that time. Your Honor, this case, one of the challenges of this court, for this court, is to evaluate this case as times were 28 years ago, and one of the key differences is that it was not until the late 1980s that the judicial legal community was shocked to hear what a crafty jailhouse informant could do to manufacture a confession, a purported confession, of another jailed inmate. This was unknown. May I read to you from a 1952 Supreme Court decision that is now, this is Ninth Circuit law now because we adopted it. I'm going to read what we adopted. Given the weakness of the prosecution's case and the significance of Fink's testimony combined with the long-standing recognition that criminals, long-standing recognition that criminals who have been provided with benefits in exchange for their testimony are inherently unreliable, the prosecution's duty to disclose any evidence bearing on Fink's credibility was particularly acute. Cite, Onley v. United States, 343 U.S. 745, 1952, the use of informers, accessories, accomplices, false friends, or any of the other betrayals, which are dirty business, raised serious questions of credibility. And that was recognized in 1952 by the U.S. Supreme Court. It was the law enforcement community was not in shock in the late 1980s that informants could concoct stories. Leslie White, when he went forward and showed how he could sit in a jail and start making phone calls and get information, that was what was the subject of the whole grand jury proceeding. That was the reason there were all sorts of new procedures implemented in the... So DAs and other law enforcement officials back in the mid-80s had no idea that people, jailhouse prisoners or whatever, inmates would concoct stories to benefit them in their own proceedings. Your Honor, let me correct any misspeaking. We'll accept your... I'm sorry, counsel, I'm going to cut you off. We understand you want to correct that. I think you should sit down and reserve your time because you will be running out of time. I appreciate what you're going to say. I know what they're going to say, but I think we need to give you a chance to respond to it. Thank you. Mr. Jackson's counsel will have the say. May it please the Court. Good morning, Your Honors. I'm Jay Lichtman. Our intent is to have me argue for 15 minutes regarding the state's appeal, and then Tracy Dresner, my co-counsel, would argue for about 10 minutes on the cross-appeal. Then we would reserve about five minutes for rebuttal, if that's... That's fine. Thank you. Proceed. Let me try and answer some of the questions the Court posed to Ms. Frierson. First of all, what seemed to have happened is along the lines of this, according to the record. It was a Detective Galissi. This is brought out in the reference here. He was from the Long Beach. He was a Long Beach police detective. According to Michaels, Michaels acknowledged that Galissi schooled him on how this system works, where the informant gives information to the police and the informant gets a benefit. Galissi schooled Michaels as if he really had a schooling, but Michaels acknowledged that Galissi schooled him. Galissi was from the same police department as Collette and Wren. Collette and Wren were the two case agents, essentially, in this case. In the spring of 1978, around April or so, that's when Michaels started cooperating. That's when Michaels had this contact, probably had it before that, with Galissi. That's when Wren and Collette had contact with Michaels. Also, there was a connection with Deputy Shea, who was from the L.A. County Sheriff's Department. It appeared that Galissi had some connection to Deputy Shea. A curious thing also happened around that time with McFarland. McFarland supposedly gave a statement to Collette and Wren in October of 1977 regarding Mr. Jackson. It was the practice of those detectives, according to their testimony, that if an informant gives a statement, they go down and they memorialize it. Well, they waited for four months until, they say, approximately February of 1978 to actually tape record McFarland's statement. At that time, McFarland and Michaels... I'm sorry, I'm going to get a clarification here. At what time did McFarland go to police and let them know that he had information that would be valuable? Well, McFarland and the police claimed that McFarland gave them some kind of statement. We're not exactly clear exactly what was in it, but that was around October of 1977. I thought that McFarland's testimony was that he wasn't even housed with Jackson, didn't overhear his conversation to other inmates until November of 1977. It wasn't until late January or February of 1978 that he finally had an opportunity to get up close to Jackson and press him for further information. I think it was Michaels who claimed that he overheard this in January and February of 1978. I thought McFarland gave the statement in October of 1977. Perhaps you're right, maybe it was November of 1977. But the point is, the tape recording of that statement was not until February of 1978. The police waited essentially four months. And that was the time that McFarland and Michaels were housed together as trustees in the L.A. County Jail. Of course, this was never brought out at trial. So, actually, they were together collaborating, in effect, as to what was going to be said regarding Mr. Jackson. At the same time, D'Lisi was schooling Michaels about how the system worked. And the grand jury investigation that later came about made it quite clear that this practice of schooling informants, of informants knowing how the system worked, of informants getting police reports, of informants getting coaching by the police department, of informants learning facts that way and then selling the facts, essentially, to the police, that had been going on for years. And the informants knew about it, and the police knew about it. That was the way the system worked. It wasn't like the grand jury came out with some revelation that nobody knew about it. Everyone knew about it. Fortunately, they finally admitted it and recognized the system, and the D.A. decided to do something about it. And, in fact, the legislature passed a rule about use of informants. Well, how do you respond to counsel's argument that they would not have been impeached because they only confirmed details that were either expressed or implicit in Mr. Jackson's admissions to the police? As the grand jury mentioned, that's the real danger of informants, is that they learn details of a case by either reading the police report, being coached by police. In fact, I think this Court in Hovey acknowledged that coaching of informants is a reasonable argument, and it is a reality. I mean, that's how informants learn reports, learn details about cases. Okay. Counsel, let me tell you what's bothering me about this. The California Supreme Court found that we had both an Ippu and a Brady violation here, and I don't know why we should revisit that judgment, whether that's under California law, whether we've got Teague problems, doesn't really seem to matter to me. We've got, they've said, there's an Ippu problem and a Brady problem here, and this information should have been disclosed. The basis of the California Supreme Court's decision was that there was no prejudice, cited two things. First, that Jackson corroborated all of these details in his statement to the police, and, second, his admission that he killed these ladies was confirmed by a number of other witnesses. Now, could you address that evidence, because that seems to me to be the critical evidence. I think there's an Ippu and a Brady violation. I'll tell you where I am. I think there's an Ippu and a Brady violation. The question is prejudice, and I want to know why the California Supreme Court, after having looked at this, obviously a close case, got it wrong. Well, there wasn't other evidence in the case that was sufficient to satisfy the requirements of the special circumstances. The special circumstance requirement, as you're aware, of course, is that they have to prove beyond a reasonable doubt that Mr. Jackson was present, personally present, and that he personally killed Miss Ott or personally aided others in killing her, and that he did so with the intent to kill. And everything's going to come down to what was his intent. Correct. And so that's going to send us right back to what Jackson told the police, what could be confirmed in the circumstantial evidence as the forensic evidence in the apartment, and what he told his neighbors and what they testified to at trial. You have to start with the informants. I don't even want to start with the informants. The California Supreme Court said, and I've tried to explain this now. I understand. So you want me to focus on the other evidence. The California Supreme Court said we're going to take them out of the equation, but these guys seem to be confirmed by everything else that we have here. So their evidence seems to be quite consistent with that. The California Supreme Court said there is ample other evidence here that demonstrates that whatever error was made, there was no prejudice. Let's look at the other evidence. The first other evidence, which was talked about a few moments ago, is Mr. Jackson's post-arrest statement. If you look at the post-arrest statement, and you can't conclude that the post-arrest statement is true in some respects and false in others. If you're going to rely on that statement as true, then you have to look at the full statement. What he said in that statement, first of all, he was clear that his intent in entering the apartment and throughout his being present in the apartment was to steal, never to kill. In fact, he mentioned during the post-arrest statement that he did not want any contact with Mrs. Ott. He said, quote, I wasn't going to go into the room where she was, no way, end of quote. Also, he explained when Mrs. Ott refused to tell him and the others where the money was, his reaction to that was not to attack Mrs. Ott, but to go ahead on his own and look for the money. That, I think, further supports a lack of intent to kill Mrs. Ott. Also important is he explained that to go into Mrs. Ott's apartment to begin with was not his idea, but it was Mr. Wells' idea who suggested that they do a burglary when Mrs. Ott was not home and Mr. Jackson agreed to go along with him. Also, Mr. Jackson was asked whether he noticed that Mrs. Ott had been choked. He said, I didn't observe any choking. Of course, he didn't choke her, and he didn't observe anyone choking her. He did acknowledge that Mr. Smith struck her once, and Mr. Jackson said he probably, he, Jackson, probably hit her on the jaw once and shook her. But that certainly doesn't show any intent to kill, and even if Mr. Jackson had been present in the apartment while others were attacking and killing Mrs. Ott, the mere presence of Mr. Jackson there would not show an intent to kill. Here's what the California Supreme Court said about this. Although defendant did not admit in his statement to police that he acted with intent to cause Mrs. Ott's death, his statement did acknowledge that he knew when he participated in the brutal beating of the elderly Mrs. Ott that only a few days earlier the elderly Mrs. Curtis had died from a similar assault in which defendant also participated. Thus, defendant's own statement to the police went a long way toward proving the element of the special circumstance allegation. I just don't follow that, Your Honor. The fact that he knew that Mrs. Curtis died a week or so before doesn't show he intended to kill Mrs. Ott. In fact, it may be a reason why he would be sure not to kill Mrs. Ott because of what happened to Mrs. Curtis. Mrs. Ott could have identified him, right? That's not actually what the post-arrest statement says. The AG made the argument. But I think that's a reasonable inference. It was only four apartments in the building. Except for one thing. According to the post-arrest statement, Mr. Jackson said it was dark in the apartment. It was dark in the apartment. It's unlikely Mrs. Ott could have recognized him. And even if she did recognize him, that doesn't mean he intended to kill her. All the other evidence of fair reading of the post-arrest statement is that he had no such intent to kill her. What is the standard of deference that we're supposed to give to the California Supreme Court in this case, given that it's pre-EDPA? I think you make a de novo review. You're not bound by legal findings of no prejudice. And neither was Judge Rafied. He was permitted, I believe, to make a de novo review and not bound by any finding of lack of prejudice. And how much deference should we give to the findings of the special referee? Well, as you know, we argue that findings of fact by the referee, you're free to give that a preference if you deem it appropriate. We don't believe there's any bar from this court adopting the findings of the referee, as long as the California Supreme Court didn't reject those findings. I think you're free to give it a presumption of correctness. And even if you didn't give it a presumption of correctness, I think you're certainly free to, because it's part of the record, to decide that whatever certain facts that are found by the referee are supported by the record and find that in your decision. What's the test that we apply in evaluating the prejudice here? That is, materiality. Is it reasonable likelihood or reasonable probability that the jury's verdict might have been different? You're talking about the Brady Standard? The Brady Standard, as you know, is whether there's a, quote, reasonable probability that the verdict would be different if there had been disclosures. I'm sort of paraphrasing it, but the NAPU standard is, quote, any reasonable likelihood, end of quote, that the false evidence could have affected the verdict. And I think that… Is there any significant difference between those two standards? Well, the way I interpret it, it's pretty close. But by saying any reasonable likelihood seems to be a less severe standard to find. But I think they're pretty close. Essentially, they both look at whether the trial was fair. And if you consider the impact that the informant's testimony had on the case in terms of the intent to kill and the fact that they would have been severely impeached had the Brady disclosures been made and had it been revealed that they committed perjury while testifying, I think that these standards are clearly met. And I think Judge Raffitti was correct in finding them. The thing that I guess bothers me in applying that standard, and I guess this is more for the benefit of the State, is how much reliance the closing argument placed on the testimony of Nichols and McFarland as demonstrating the intent to kill. I mean, he actually goes on for pages. He says there's three people. One is Eileen. Is Eileen her first name? Eileen. But she is only a witness to the statement as to Curtis's death. So we have to go to Ott. And what he relied on in the argument was Mr. Michals and Mr. McFarland, their testimony. And how much should we weigh that into the calculation of making the materiality decisions? Well, I think it's a factor. I mean, clearly the DA was talking about the burglaries, the murders, and also the specials. I think he certainly relied on the informants as proving his case and made reference to them in terms of proving the specials. I don't know that the AG liked to count pages. I don't think that's what's critical. I think what's important is the substance of the argument. Just like in the reference hearing, when you have testimony from the defense counsel who believed and testified that the informant's testimony was, quote, the guts of the case in terms of proving special circumstances. That's a factor to consider. Also a factor to consider is then when the detectives, Collette and Rand, I believe, testified for Michals to reduce his sentences or keep from getting more jail time, they testified about the significance of Michals' testimony, how critical it was to their case. I think these are factors to consider. But it comes down to the evidence and looking at the impact that the informant's testimony had on the proof of special circumstances. And clearly it was overwhelming proof, particularly when you compare the testimony or the other evidence in the case. Well, why can't we rely on the physical evidence, as Judge Bivey indicates, you know, the ample physical evidence of injury? Well, there's no question that Mrs. Ott was beaten and apparently sexually assaulted. But those types of facts are found in police reports. That's what informants learn and that's what informants parrot back to make it appear that the post-arrest statement of a defendant is accurate because the argument always is, well, how did the informant find out about it unless the defendant told them about it? And we know from experience and from what was brought out of the reference hearing and from the grand jury report that informants learn this information. That's what makes them dangerous. No, I don't mean it from that perspective. I mean from the, I guess, as you're talking, I guess your answer would be, you know, there was all this physical evidence, but what was the thing that would tie Mr. Jackson to the physical evidence? Exactly. There's no dispute about the fact that this woman was terribly beaten. But just look at that for a moment. Look at Michael's testimony. His claim was that Mr. Jackson told him, this was the scenario that Michael's painted, that Mr. Jackson, he saw Mrs. Ott walking out of the bedroom. Mr. Jackson went up to her and beat her. Then Mrs. Ott retreated back into the bedroom. Mr. Jackson continued to beat her into unconsciousness. Then Mrs. Ott awoke from unconsciousness. Mr. Jackson attacked her again, beat her into unconsciousness again. Then he said Mr. Jackson claimed, or he claimed Mr. Jackson said he kept firing on this woman. He beat the woman again. A terrible, brutal beating. And then after all that happened, Michael's claim that he sexually, Jackson said he sexually assaulted this woman and that it was a racially motivated attack. And then McFarland threw in the fact that Jackson laughed about it afterwards. So, sure, there's physical evidence as to what happened to Mrs. Ott, but it was the informants that tied that physical evidence to Mr. Jackson by describing their claim that Mr. Jackson told them about how he inflicted the physical evidence on Mrs. Ott. And without those informants, you would have a completely different case. And it may very well have resulted in no special, probably would have resulted in no special circumstances. All right, counsel, you're over your limit. Thank you. Thank you. Good morning, Tracy Dressner for Mr. Jackson. And I'm going to switch to the issue of guilt-based appeal, particularly the racial issue. When I first started working on this case 11 years ago, one of the first things I read was Mr. Jackson's attorney's argument at the penalty case. This is his argument to try and convince the jury to spare his life. And he said, what are we going to do with these young blacks? One thing for sure, you're not going to take them all out and you're not going to shoot them. You're not going to take them out and put them on a boat and ship them back to Africa. You're not going to take them and ship them in one state. They are here to stay. And I was astounded. And then I went back and started reading the trial, particularly the jury void here, and found Mr. Jackson's attorney, state-appointed attorney, saying to jurors during jury void here things like, oh, you have a business. If you have a business that caters to rich people, then you probably don't get too many black people in there. Asking another juror, where are you living now? Isn't that the area that's getting surrounded by blacks? Haven't you noticed that your property values are falling? Counsel, wasn't he, I mean, isn't there some validity to the argument that he was trying to elicit any prejudice that might be there in order to challenge jurors who did evidence prejudice, racial prejudice? Oh, there could be certainly valid void here questions asking if you'd be prejudiced by saying, would this is a case that involves, for example, two elderly white women, my client's an African-American man. Would that affect you? Well, jurists aren't going to come out blatantly and say, oh, yeah, that's going to affect me. I'm racially biased. I mean, when's the last time you did a voir dire? The question is, how would this elicit it? Well, this may not have been the most artfully conducted voir dire that one would want to see, but it seems that he had an objective, which was to ferret out any racial attitudes and biases. And that was a strategy that was, there was a lot of debate in the state courts at that time. And I was, you know, I was a state court judge for a number of years. And I'm very familiar with these kinds of questions and the difficulty it posed not only for judges, but for lawyers. And I grant you, the words that he used and the questions that he used leaved a lot to be desired. And if he had thought it through or if Judge Fagan had been a little bit more on top of it, he could have put a stop to the form of the questions that were being asked. He was pointing out that blacks are essentially an inferior class to us whites, which was the position he was doing is not going to ferret out prejudice. All it's going to do... I understand that you disagree with his tactics. But this was an effort on his part to sort of draw all of this stuff to the surface. That is to make people hyperconscious of their own racial attitudes by blowing the whole thing up. It's a risky strategy. But it's hard to sit here and say that there's no justification whatsoever. And that this is utter incompetence to try and raise everybody's racial consciousness to the surface. It's an exaggerated effort. That is certainly a polite way of phrasing it. What it did was introduce racial prejudice into a trial that did not have to have a racial element. And by repeatedly doing this, and again, remember the jury voir dire took place in front of the whole jury panel, the entire 12 jurors who sat on the couch. Counsel, the trial had a racial element. That was the reason for counsel doing it. The racial element was that it was a young black man accused of murdering two elderly white ladies and the testimony that would come in from Michaels and McFarland that there was some racial motivation. But that shouldn't have come in. That was not a racial case. The only thing that made it a racial case was trial counsel's emphatic repeating of racial stereotypes and racially derogatory statements about blacks. And he should have objected to Michael's statement. There was no reason. I think that the racial comments by counsel is your strongest argument for reversing the guilt phase. Yes. I think that Mr. Jackson was subjected to an incredibly racially biased trial by his attorney. Racism permeated that trial. One of the key fundamental tenets of our judicial system is a fair trial. And injecting racial prejudices into this trial denies him that right to a fair trial. I point to what this court in Frazier v. United States in 1994 said, You know, as a nation we have acted decisively to remove all vestiges of racial discrimination from our lives. Not for a moment will we tolerate racist behavior in our workplaces, schools, voting booths, blah, blah, blah. With these accomplishments in mind, we can discern no reason whatsoever requiring an accused too poor to hire an attorney to protect his rights that he must not only prove that his government appointed attorney verbally assaulted him with racist threats, but that to obtain relief he'd have to show some prejudice about that. And in that case, the only thing that had happened was the attorney had told his client outside of court, he had called him a stupid nigger son of a bitch. Now, that pales in comparison to having throughout the trial, having Mr. Jackson referred to as this young black boy, the young black boy in jail garb, in prison garb, that If you want to reserve your five minutes, you should stop. I assure you we have read all of the arguments in all of the cases, and if you are not giving up any argument, it's just by not mentioning it here in oral arguments. So if you want to reserve some time. I'll reserve my five minutes. All right. Thank you. Responding, Your Honor, to the argument that the special circumstances, the district court's judgment on the special circumstances should be affirmed, responding to that argument. Counsel has relied on information that was set forth in the grand jury report. And he has suggested that Mark Nichols and Ronald McFarland might have learned the details of Jackson's crime. Including such details, not go through them all, but Mark Nichols attributing to Jackson a statement that he picked up a bottle next to a stand next to her bed. And the police officer who first walked into her bedroom said there was a bottle on the floor adjacent to the bed next to a knife stand. That level of detail is being attributed to, well, maybe he read some police reports. Here is the problem, Your Honor. The bottom line. There has been no allegation in petitioner's petition for writ of habeas corpus that that is what has happened. In 28 years of litigation, there's been no presentation of any evidence that that is what happened. And far more fundamentally, he has not alleged it in his petition. And that is the end of that allegation. Didn't the report of the referee say that there was collision between Nichols and McFarland? The report of the referee said, the referee thought that there was enough that if counsel had investigated, he could have found out there were contacts between the two and argued that to the jury. But a fundamental problem with that report of the referee, Your Honor, that portion of the findings of the referee, is that under California law, California Supreme Court has said that extraneous findings of a referee we appoint, if we do not adopt those findings, those are extraneous and they are irrelevant. And that means that the findings of the referee, which were not adopted by the California Supreme Court, are not findings of a state court of competent jurisdiction. As I understand it, what the referee said was that there was some evidence that Nichols and McFarland had an opportunity to talk and therefore the counsel could have suggested to the jury that they had colluded. But the referee did not find that they had in fact spoken, as both of them denied repeatedly in their testimony before the referee, that they had had any contact before trial, other than incidental contact in the case. And certainly there was nothing in front of the referee to show that they had colluded with each other. But, Your Honor, even if, assuming for the sake of this argument today, and not agreeing with it, but assuming that the worst case scenario for the people's case, that Nichols, because he had such incentive to benefit himself from cooperating with prosecution. And getting a conviction. To get a conviction. And getting a conviction. Yes. His greatest incentive was. Tremendous incentive. Right. Tremendous incentive that he somehow or another learned everything that he learned. Not from Jackson. But from McFarland. And therefore added, you know, said, well, yes, I heard it from Jackson. When he really hadn't heard any of that from Jackson, the jury still would have been left with the fact that at least one of them had heard those details. And that would have been McFarland. Who came into the prison, into the jail system, earlier in 1977 than Nichols did. Heard the statement that Jackson made in November, October or November. Spoke to the police in February of 78. And Nichols did not go to the police until March of 78. And it was McFarland who had, who the benefits supposedly to McFarland, if it had all been disclosed and brought out in front of the jury, was as follows. That McFarland's attorney, after McFarland went to the police, without it being a condition precedence of anything, McFarland went to the prosecutor in this case and said, would you please give me some benefits, sentencing benefits for my client, for his cooperation in this case. And what the jury would have heard was that the prosecutor said, no. No sentencing benefits. Then McFarland's attorney replied, well, if you can't help on the sentencing, could you at least, would you at least be willing to write a letter on behalf of McFarland so he can serve his prison time in Arizona rather than in California. And Jackson, I'm sorry, Jackson, the prosecutor, said, yeah, I'd be willing to do that. A willingness to write a letter as to where you're going to spend your prison time is not, is not a great incentive to have made up a story that one told the police before even the request was made. I want to ask you a question on this. I got confused by how you, your opening comments about that, even if all this stuff, the incentives and the psychiatric reports and all the things that could have been turned over had been that they would not have been impeached. And so I took that to mean that they're, that you're, are you saying that their evidence, I mean, their testimony was in fact material? Or, and if you're saying it wasn't material to the conviction on the special circumstances, particularly the intent to kill, then why did the state, why would the state go ahead and put it on? Well, it is a piece of evidence, Your Honor, but it's not a piece of evidence that would have, that would have to use the correct phrasing here, so I don't get it wrong. It was not a piece of evidence that reasonably could be taken to put the whole case in such a different light as to undermine confidence of the verdict. If the impeachment stuff has, and the confidence in the verdict is not undermined because... That's not the standard, though. That's the BRAC standard, right? I mean, the standard for Nippu and Brady is reasonably likely that it could affect, affect, not confidence in the verdict is undermined. That's the BRAC standard, which doesn't apply to Brady and Nippu. You are right, Your Honor. I know. You're using the wrong standard. I meant the materiality standard for Brady. Is there, it can, it can be, the materiality standard for Brady can be demonstrated by showing that favorable evidence that was not disclosed could reasonably be taken to put the whole case in such a light as to undermine confidence in the verdict. And knowledge that the prosecutor in this case was going to, was willing to write a letter on behalf of McFarland so he could serve his prison time someplace else other than California is not such that it would undermine confidence in the verdict. And McFarland's testimony is not affected by the impeachment evidence that was not disclosed. In the, Judge Wardlaw had asked Mr. Lichtman about the closing argument. How extensively did the DA rely upon? Barely. The DA's reliance was on the strangulation. The DA told the jury that the intent to cause death can be determined by strangulation. Did he, did he at all reference in closing argument the testimony of Michaels and? There were two arguments, an opening argument and a closing argument. And the closing argument was merely to buttress, to respond to argument of Jackson's counsel that the informants should not be believed. And the closing argument was, yes, they should be believed. But with regard to the intent issue, intent to kill issue, the prosecutor did not rely on very much on the. Very much. Not, not very much, not very much. Instead, what the prosecutor argued to the jury, that intent to kill can be determined from the fact of strangulation. And of course, the informants, neither McFarland or Michaels, said anything at all about strangulation. Counsel, there's, we don't have any direct evidence. Andy, we don't, nothing even in McFarland and Michaels would suggest that Jackson strangled Mrs. Ost, do we? That is correct. The, the, the position I think has to be that it's likely that somebody else strangled her, but that, but that Jackson either aided or, or furthered this by knocking her unconscious. In other words, he sort of created the opportunity for strangling her easily by knocking her out and beating her. Yes. There is nothing in the record to indicate who strangled Ost. Counsel, can I just read to you what, I mean, I've read the entire state's closing argument. And I'm sorry, but I think, I mean, I think what you're, how you're describing it is at best an exaggeration. Because what the attorney actually said was that you could just take away all the other evidence and rely on the testimony of Mr. Michaels and Mr. McFarland, and that would be sufficient evidence. That's at ER 1401. Oh, Your Honor, that, that was in reference to Mrs. Curtis' murder. Oh, no, it wasn't because Mrs. Curtis was supported by Alita Gaines, and that's the specific distinction that the attorney is making at this page of the record. Your Honor, as, please, I don't, I don't want in any way to mislead the court. Well, it's okay. I know it's all, I know, I know your argument's in the brief. It's there. It's in the record. Yeah, it's in the record and it's in the brief, so don't worry about it. But I'm just saying, I think that's somewhat of an exaggeration. There's a point that he said we can rely on the testimony of the witness, including the informant. He had that, the whole preceding portion of that was, was talking about Curtis' murder, and then shortly thereafter, after he made this comment, shortly after that he said, now turn into the murder of Mrs. Ross. And the informant can be relied on as evidence of murdering Mrs. Curtis, because Jackson's only murdered two old women in Long Beach. So there was, there was, Yeah, well, I, you know, I have the, I have this argument in front of me, and I'm reading, immediately preceding it, he, he turns to Mrs. Ross. So I really would appreciate not being told things that are contrary to exactly what I'm reading. I mean, it's just, what I think you should do, since you're about to run out of time, is tell us your strongest argument. What you, how you, what you think is your very, very best argument why we should reverse these, why we should reverse the district court on the special circumstances findings. Because neither, because the jury had before it evidence that would not have been diminished in evidentiary value by any of the information which was not disclosed about McFarland and Nichols, that, that would not, that would not have been diminished in any way, shape, or form. And as a consequence, no constitutional errors occurred in this case, as to the special circumstance findings, or as to guilt. And if they did occur, and if there's a harmless error, and if a, and if a harmless error standard applies, there was no, there was no harmless, and there was no prejudicial error. In the district court's judgment, denying the writ on the murder and the burglary of her conviction should be affirmed, and its judgment granting the writ on the special circumstance findings should be reversed. Unless there are any questions.  All right, thank you very much. Thank you, Mr. Counsel. We appreciate the argument on both sides. It was very helpful for us today, and they'll be, oh, you get, you're right. All right, you may sit down. You have very limited time, though. And if you really think you need to take it, take it. But if you don't, I wouldn't press it. I think we've been through that. And everything is in your brief. I want to change my answer to one of the previous questions about my strongest argument. Okay, now what's your strongest argument? Then I think we have to look at the cumulative errors in this case. This is a case that was permeated by prosecutorial misconduct and permeated by ineffective assistance to counsel. And in addition to the racial stuff, however you want to view it, that was compounded by trial counsel's refusal to assist Mr. Jackson in his desire to work today in clothing, which then required Mr. Jackson not only to attend trial every day in jail clothes, but it was repeatedly pointed out to the jury by Mr. Jackson's attorney that these were jail clothes. In addition, both the court and the prosecutor and the trial counsel all let in the sexual assault bottle evidence after the court explicitly ruled that any evidence relating to the bottle and relating to the vaginal injuries on Ott would not be allowed in the guilt phase. Notwithstanding that, the evidence came in through the doctor, the evidence came in through McFarland, the evidence came in through Michaels. And then bizarrely, at the end of the guilt phase, the judge acted as if it had never come in and said, of course, you know, we had barred it in the guilt phase and it was only going to come in in the penalty phase. But the nature of that had nothing to do with any of the charges. There wasn't a sexual assault charge. Yet it allowed the informant to portray Mr. Jackson as this horrific man who not only beat repeatedly on the elderly women, but then assaulted her with a wine bottle. Then compounded by that there was these two, there wasn't a whole lot of evidence in the case. There's been fancied about quite a bit that outside the informants there was... Were Mr. Jackson's fingerprints found on the wine bottle? No. There was no evidence one way or the other. Nothing came in about fingerprints on the bottle. That two of the witnesses' testimony came in through their preliminary hearing testimony, which was not, although theoretically subject to cross-examination at the time,  after this completely perfunctory and last-minute attempt by the DA's office to find these witnesses, which it set out in the brief was pathetic at best and certainly showed a lack of due diligence. And then on top of that, there are the other prosecutorial misconduct findings that were made by the district court that they said in and of themselves were not, didn't rise to the level of reversible, but certainly come into play in the cumulative error analysis. And that was the prosecutor's statement not once but twice in closing argument at the guilt stage, saying that Mr. Jackson, referring to the testimony that he laughed when he supposedly, when he made a statement to Eileen Gaines and that he laughed supposedly when he told McFarland about the bottle. And then the prosecutor said twice, as you all saw Mr. Jackson laughing and smiling in the courtroom, inappropriately and impermissibly commenting on the demeanor of a non-testifying witness, a non-testifying defendant. And then on top of that, also making a comment about Mr. Jackson's failure to testify by saying, refusing to stipulate to Mr. Jackson's age at that time, even though he full well knew that Mr. Jackson was 18, saying, you know, if Mr. Jackson wanted that in, he could testify. When you look at the full picture, this just is not a fair trial. It's not the kind of trial that society should certainly be okaying, especially in a situation where Mr. Jackson could still potentially be sentenced to death based on the guilt stage. There are certain fundamental requirements that we have in trials that need to be respected, regardless of whether at the end of the day you say there was enough evidence to convict him in any sense. There still are fundamental principles that need to be maintained, and we owe it to Mr. Jackson, as we owe it to every member of our society, to ensure that our trials have that fundamental fairness, especially if you're going to seek death. Thank you. All right. Thank you very much, counsel. And I'll repeat my comments. All counsel made a very important contribution to the argument and our analysis of this case. Thank you. This session of the court is adjourned for today.
judges: Wardlaw, Paez, Bybee